We'll hear argument now in the case of the United States v. Dixon. Good morning and may it please the court, Lauren Roberts on behalf of Marcus Dixon. On December 18, 2019, probation officers claiming to act under the authority of Marcus Dixon's supervised release conditions conducted a series of warrantless searches. The searches were unrestrained and boundless. They took over five and a half hours, they spanned two states, and they concluded in the search of a third party's home and car. Despite carrying the burden to justify warrantless searches and the suppression litigation, the government offered no evidence to support their version of events. They cited no probation memo, affidavit, or police reports. Similarly, on appeal, the government cites to the same unsupported allegations raised in briefing or to the trial testimony, both of which were unknown to the court at the time they ruled on the motion. Based on the facts known to the court during suppression litigation, Mr. Dixon had a subjective expectation of privacy in the places searched, and the searches were not conducted pursuant to his conditions. Accordingly, we ask this court to vacate and remand with instruction to grant Mr. Dixon's request to be expressed. However, to the extent that the court feels there are unresolved factual disputes needed to determine the legality of the searches, we ask this court to vacate and remand for an evidentiary hearing. To the former point today, I'd like to address why Mr. Dixon— Did your predecessor ask for a hearing under Simmons against the United States? Under Simmons? Yes. I'm sorry, I'm unfamiliar with the case. Well, I will ask that question of your adversary, but it seems to me the critical case is Simmons, which nobody mentions on appeal. If you could briefly describe the facts of Simmons? No, this is not the time.  Ms. Roberts?  So, I think I'm looking at the right set of supervised release conditions from the Southern District of Iowa. Which conditions are you looking at? We realized that the government attached to their brief a different set of conditions than the searches were conducted under. The correct conditions— I'm looking at what looks to me like a judgment from, let's see, the United States District Court for the Southern District of Iowa in case number 315CR35. I believe those are correct, but it's attached to Record 32, Exhibit 3 is the correct conditions, the conditions attached by the government. The relevant lines here are double-typed over, so I can't tell what the docket number is. But the search condition says an officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his release and or that the areas or items to be searched contain evidence of this violation or contain contraband. The and or gives me some concerns there because, as I understand it, at the time of the December searches, there was not just reasonable suspicion but probable cause to believe that Mr. Dixon had been violating the terms of supervised release by continuing to deal drugs and to be armed while doing so. Is that right? We would disagree with that assessment. There was an arrest warrant out for him? Yes, based on the October 20th events. Which indicated a tie to that car and to the drugs, firearms, and ammunition found within them, correct? With the Mitsubishi on October 20th, yes. So there was probable cause to believe that Mr. Dixon had committed a discreet offense by possessing firearms and controlled substances on October 20th. We do not challenge the use of his conditions to revoke his supervised release on that basis. However, we challenge the invocation of his conditions based on those violations to justify a search nearly two months later. The assumption that was just a one-off. Bad luck. Perhaps not bad luck, but there's no indication of continued criminal activity that the probation officers could rely on to invoke his conditions. While we're talking about the accident, there's one thing I want to make sure I understand. Mr. Dixon was convicted on six counts, right? Three from October and three from December. Yes, Your Honor. So, is there anything that was obtained in the December searches you're challenging that contributed to the convictions for the October events? No, Your Honor. So there's no challenge to those three convictions in essence? No, Your Honor. There's no challenge to those three convictions. The evidence gathered from December 18th was solely for the second set of charges which we challenge were gained in unreasonable warrantless searches that were not justified by his conditions. To Your Honor's point regarding reasonable suspicion to search on December 18th, I'd like to point out to the Court that after October 20th, there was no intervening or ongoing investigation. Probation officers were armed with no new facts until they began their search on December 18th to suggest Mr. Dixon was partaking in any continued criminal offense. The lack of timely information may be, isn't necessarily fatal, but we recognize that it's critical in cases regarding firearms and controlled substances as they're perishable and consumable or immobile and the likelihood that they'll be found in the same place nearly two months later is substantially affected by the timeliness of the information. While timeliness isn't fatal to all cases, in a case such as this where there's no other indications, there's no indication of ongoing criminal activity, there's no indication that officers were searching the most likely place. Ms. Roberts, what about the fancy clothes and the fancy car and the reporting of no income in that intervening two months? Yes, the government does point to this in the intervening two months, but that allegation is completely unsupported and unsighted in the suppression litigation and at trial. It's an allegation with no evidence. So the thing that I'm struggling with here, Ms. Roberts, and I hope you can help me with, is the tension between what we'll loosely call standing under the Fourth Amendment and the consequences of, in essence, his possession of the items found in the Audi and the phone. And I guess it seems to me that you're trying to maintain a very difficult middle ground in which he has standing to assert privacy interests in these places and objects, but the government hasn't shown that they're his sufficiently to be able to search them under the supervised release conditions. Do you see my tension, my problem with this? Can you help me out? Yes, that's the tension the lower court recognized. I think part of why we're placed in the position to argue it is because the government first placed us in the position by arguing that they could invoke his condition to search property of unknown ownership and then deny him standing to challenge those searches. So that's why we asked the court to recognize a limited form of standing where the government uses a probation supervisor's search conditions to search unknown or third-party property. And how would that work, do you think? The defendant would retain a sufficient expectation of privacy solely to challenge whether the searches fulfilled the requisite preconditions of his search requirement here, whether the items were his and whether they had reasonable suspicion. I guess I'm still having a little bit of trouble with this because in essence you'd be saying, I think that we would grant someone in Mr. Dixon's position a right to assert potential Fourth Amendment rights of other individuals, unknown. It wouldn't be an assertion of third-party rights. It would be a challenge to the invocation of his conditions to avoid the warrant requirement to search unknown property. It's similar to the... But if they're right, that the locations are tied sufficiently to him, then it's justified under the supervised release conditions or at least I understand you don't want to concede that but there's a pretty good argument to that effect. But if the government's wrong, it hasn't violated his rights but it may have violated rights of other parties who may be relegated to the tender mercies of what's left of the Bivens Doctrine. I would point this court to the United States v. Jackson where the court considered the same exact issue in analogous context of executing search warrants in third-party premises despite recognizing that the homeowner, the third party in that case, may have a civil remedy under 1983. The court went out of its way to consider whether Jackson, the defendant in that case, would have a limited form of standing and they recognized that this court as well as other courts may have to recognize a sufficient limited form of standing in order to uphold the rule, the Supreme Court's rule in Stegall. We assert that similarly here, a limited form of standing is necessary to uphold the probation, the conditions by which probation is bound. The Supreme Court held in Sampson that a defendant can argue at a suppression hearing that he is the owner or occupant of spaces without that evidence being admissible in the criminal trial. The Sampson rule is designed to solve the problem that your client says he found himself in, first having disclaimed ownership, then claiming it in order to seek suppression, and then disclaiming it again at trial. But if there was no request for a hearing to use the rule of Sampson, I don't see how your client is anywhere. Right? The Supreme Court has devised a doctrine for this very problem. And if Dixon never tried to use that doctrine, where does that leave him? I'd like to first point to the court that the alleged dissociations and disavows that the government assert underlying their abandonment theory, and the court concluded evidence Mr. Dixon's lack of a subjective expectation of privacy were never supported at the suppression hearing, or a trial testimony. It was never conclusively found or supported by evidence that Mr. Dixon lied about his association with the Pontiac, the Sylvus House, or the Audi. To the extent that Mr. Dixon didn't meet his burden for an evidentiary hearing, we assert that that's because the government first failed to put forth evidence to justify the warrantless searches. He had nothing, no facts and evidence to combat, and he was asked to negate an absence of fact, essentially. I see I'm about to go into my rebuttal time, so I'd like to reserve the rest of my time for rebuttal. Thank you. Certainly, counsel. Mr. Simpson. Good morning. Let me ask you the same question. Did anybody request a hearing to take advantage of the rule in Simpson? Are you talking about Samson, Your Honor, the Supreme Court's decision?  I'm sorry. Your Honor, I am not. It's clear that no one here has heard of Simmons. It's only a decision of the Supreme Court designed specifically to deal with the sort of problem at issue in this case. Your Honor, I can definitively say that the defense did not ask for any kind of hearing like that. They asked for an evidentiary hearing on the suppression motion. They asked for a hearing where they would try to solve this problem. And actually, one of the things I wanted to say at the beginning here, Your Honor, is we actually don't see a problem here. We don't see any tension between these two, resolving these two issues, the expectation of privacy and whether he can challenge the search and the reasonableness of the searches. The first issue, whether Mr. Dixon had an expectation of privacy so that he could challenge the searches, that depended on his own statements to the probation officers. With the Supreme Court held in Simmons, he can contradict at a hearing without any risk of perjury or without any risk that the testimony at the hearing will be introduced at the criminal trial. And he did not do that, Your Honor. But when you have one of these cases where a defendant disclaims any property or privacy interest, that's what triggers the approach of Simmons. And it's most disturbing that neither you nor his trial lawyer seem to be aware of the governing rule established by the Supreme Court. Your Honor, I will certainly be aware of that in the future, and I apologize for not having pointed that out. But whether he has an expectation of privacy here depends on his own statements, whether they are true or false. The second question, the reasonableness of the searches depends on the actual facts, the true facts. And he lacked an expectation of privacy in the place of search because of his own statements here. But the searches were reasonable and were covered by the fact that he did in fact have a possessory interest in those places, contrary to his own statements. In other words, Mr. Dixon's false statements to the probation officers cannot obviate the fact that he did in fact have possessory interests in the place of search. So further on the expectation of privacy, I think we first need to make clear who bore the burden here. This court has said a defendant who objects to a search as violating his Fourth Amendment rights bears the burden of proving that he has a legitimate expectation of privacy in the area searched. And on the merits of that issue, the question on expectation of privacy is whether the individual, by his conduct, has exhibited an actual subjective expectation of privacy. And here, of course, Mr. Dixon disclaimed any expectation of privacy in the place of search. He said that he did not drive to his probation appointment to the courthouse. He said that the Purple Pontiac did not belong to him. He said he didn't have a cellphone. He said that cellphone did not belong to him. How do we know all that? Part of that, Your Honor, and I know this came up in the defense's argument, was in the government's response, document number 29. Is it backed up by an affidavit from any agents or probation officers? No, Your Honor, it isn't, and I imagine the court has seen this a lot. Actually, I have not. At least the courts, the judges in our district,  a lot of times, they will see filings reciting facts, and then they will rely on the opposite party, the other side, to challenge any of those facts. It sounds like in a civil case we would just take for granted what the complaint says, unless the defendant specifically comes forward with evidence contradicting. That sounds like a very unusual procedure. It's not exactly a complaint, Your Honor, and often the filing will say that this is based on the statements of the probation officers, and I believe that's what it was based on. And the district judges are saying good enough? Unless my experience,  is often, now, of course, this is different from a warrant case. There's obviously an affidavit. I would think that the need for an affidavit is stronger when we're dealing with warrantless searches like this. At least with a warrant, you've got already an affidavit supporting the warrant. I understand that, Your Honor, but again, I think the judges are relying on the party's attorneys to say, no, that's not true, and to bring in facts to back up their denial. Counsel, I saw a reference to a U.S. probation office memorandum about the December 18 searches. I know when I was a district judge, I would get these types of memoranda, but I don't see it on the record. I didn't see it in the Iowa or the Illinois cases, that particular probation memoranda. It's not an affidavit, but it's something, but I don't see it. Is it in the record? Now, we do have, Your Honor, we do have from the Iowa case, we have a petition for a warrant to get a warrant based on the October events, and then we have an addendum to that. Again, I'm afraid the ECF, the ECFs are, in one of the cases, it's 32, and I believe in both, oh, I'm sorry, I believe in our case, these were filed in our case. Supplement, the defense filed, when they filed their supplement to motion to  they included these. It's in our case, it's 32-1 and 32-3. Those are the petition from the probation office and an addendum to that petition. And then, again, in our case, the district court docket, 32-4 is a supplement to the motion to suppress filed by the U.S. Attorney's Office in Iowa. So, Your Honors, for those reasons, we believe that Mr. Dixon certainly disclaimed any expectation of privacy in the Pontiac and in the cell phone found in the Pontiac. And on the Audi and the house in Sylvus, he told the officers that the Audi key that he had in his pocket was just a key chain and that he did not have access to an Audi and that his house key was for a house in Rock Island. One of the things we need to moving on to the reasonableness of the searches I think it's very important to realize here, to remember here, that we're not talking about just someone whom the police just happen to encounter in, for example, in a traffic stop. Rather, Dixon was a person on supervised release and that affects both his privacy interests and the government's legitimate interest in the search. Mr. Simpson, could I ask you to focus on the December search of the Pontiac which is what turned up his phone which is what turned up the links to Silva's house and so on. Within, so just working through the terms of the conditions of supervised release, what's the theory for searching the Pontiac? Contraband,  What indication is there or was there at the time that there would be contraband in the Pontiac? Your Honor, this partly goes to the staleness argument and I assume partly the court is thinking of that. I'm just, I just want you to walk us through he's under arrest in the office, right? And I take it the Illinois probation office had moved across the river because of, is that right, some disruption in the court? No, this search was done by probation officers in the southern district of Iowa. Okay. So he had a conviction there and that's where the conditions Okay. And what's the, but just walk us through the theory for searching the Pontiac under those conditions at that time. So obviously his supervisor, the fact that he was on supervisor release had diminished his expectations of privacy. Two months earlier he had been driving that Mitsubishi that contained three guns and distribution amounts of cocaine and marijuana. The probation officers saw him drive the purple Pontiac to the courthouse. When he came into the office and they searched him he had the key to the Pontiac in his pocket. No one else was in the car and Dixon lied about having driven to the appointment. Well, sorry, he lied about what? Having driven to the appointment. He said, no, I didn't drive here. That's based on this statement in the briefs that's not backed up by an affidavit though, right? Correct, at the time. Now, of course, there was a trial here and all of this information came out at that time as well. Yeah. Okay, so the theory is we've got probable cause to believe he's violated his supervised release condition, right? He's been dealing. Correct. And probable cause or at least reasonable suspicion that we'll find contraband in the Pontiac. Okay, that's the next part. Where does that come from? That they would find. The reasonable suspicion, yeah, that you would find. I don't know that you need that under the way this is phrased but with the and or but if you need reasonable suspicion to believe there will be contraband in the car, how is it anything other than guesswork? Well, because two months earlier he had been driving that Mitsubishi that had distribution quantities of cocaine actually, it was both powder cocaine and crack cocaine and marijuana and three firearms in the car. So that suggests that he's still operating,  from the vehicle. Or that he's still involved in drug trafficking and using guns. And also the, that, the October, well obviously he was on, he was on supervised release. He had the prior conviction in the Southern District of Iowa. They would have and the probation officers would have known about his prior history, including he had convictions for possession of marijuana with intent, possession of a firearm, both of those in Iowa in 2015. So, the October 20th episode was just another episode in his, in his pattern of involvement with drugs and guns. And really I, I think this court's experience and certainly my experience is two months is actually a fairly short time for a pretty short interval in this context. And I don't think, I don't think the defense cites any, any case law to the, to the opposite effect. Also in relation to the Mitsubishi crash, Dixon had fled from that crash. Fled, ran from his drugs and his guns. Further showing he had something to hide. And in fact they, they had to investigate to identify the driver. That was part of what they were doing in the interim. Of course you have two different, you're working with two different jurisdictions here. Southern District of Iowa and the Central District of Illinois where the, where the crash actually happened. Dixon's mother reported the Mitsubishi as stolen. I believe even while the, the police were still at the scene further indicating Dixon's criminality and further giving the officers reasonable suspicion to believe he was in, continued to be involved in drugs. So, so Mr. Simpson let me ask you what, what concerns me on this side of the case is the, the defense is urging us to follow some cases from the 8th and 9th circuits concerning what the government must show or, or to justify searches of properties or vehicles etc. under supervised release conditions out of fear that, that third parties rights might be  What do you, what, what burden do you think is appropriate if any for invoking those, such search conditions for locations that, that you find out about through investigation? We're talking about this, this court's decisions in Concepcion and Correa the use of They're related but, but I'm thinking more generally. Well Your Honor obviously we have the Supreme Court's decisions in Samson and the earlier Supreme Court decision in Knight's we have this court's decisions Mr. Samson you're not responding to Judge Hamilton's question. He's expressed concern about the rights of third parties right? If the car the Pontiac didn't belong to  and he had no interest in it presumably it belonged to somebody else right? Samson deals with a search of something that concededly belonged to the person on parole. What what is it in your view that protects the rights of third parties those who are not subject to conditions of release? Well I assume I assume the court I would think the court is not concerned about the Pontiac and the cell phone in that regard since they saw him drive. Dixon may not be able to raise the rights of third parties but we are interested in the position of the United States about how the rights of third parties are adequately protected. Your Honor, in the Jackson case that that counsel referred to that defense counsel referred to if I remember correctly that was an arrestee who was inside someone else's home with other people here we have speaking of the of that We're not asking about here right Presumably the United States Department of Justice has a view about how the rights of third parties are protected now maybe you don't know what that view is but that was the nature of the    if the evidence if the information available to the  officers indicates that the the probation that the person on supervised release has possession and use of a car of a house then they have super they have reasonable suspicion to search those those locations okay okay thank you Mr. Simpson Thank you Your Honor Anything further Ms.  Simpson   A few points I'd briefly like to address first Your Honor's question about whether the probation memo is ever cited in the record it's not um the AUSA's review of the record is cited as exhibit four but the probation memo is never attached and those facts that the AUSA alleges in his revocation petition for revocation um are never supported in the record um next to trial counsel's request for an evidentiary hearing while he unfortunately did not request a hearing under Simmons he did request an evidentiary hearing and he was relying on to invoke his conditions um as Your  pointed out this hearing was necessary to establish and for the government to meet their burden under Longmire of putting forth the facts that justify a reasonable search I think you're putting words in my mouth oh sorry but go ahead and make your point I think it's                          um similar similarly with regards to abandonment the trial court found that abandonment was a poor fit here um as Mr. Dixon unlike unlike the cases uh the government cites Alexander and Pitts Mr. Dixon had not disavowed association even on the unsupported dissociations he had not disavowed any association but he referenced the Rock Island the Rock Island house as his grandmother's house first of all it's never established how probation officers determined these statements were a lie um Silvis is in Rock Island         as within Chicago um first of all and second of all it was never established why probation officers would know that assertion was a  um and it was never established that any of the searching probation officers saw text messages that indicated criminal activity or robberies or the many different allegations they say were within the text the only   thing that                                                        or the